**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19-cr-00769 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| VENKATESH BHOGIREDDY | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant Venkatesh Bhogireddy was indicted by a grand jury in connection with his efforts to hire a hitman to murder his wife's uncle in response to the uncle's support of his wife during their contentious divorce. The Superseding Indictment charged Bhogireddy with six counts of using facilities of interstate commerce with the intent that a murder be committed, in violation of 18 U.S.C. § 1958(a). A jury ultimately returned guilty verdicts with respect to five of the six counts. Now before the Court are Bhogireddy's post-trial motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (Dkt. No. 169) and for a new trial pursuant to Federal Rule of Criminal Procedure 33 (Dkt. No. 168). For the reasons that follow, the Court denies both motions.

## BACKGROUND

In considering Bhogireddy's post-trial motions pursuant to Rules 29 and 33, the Court begins with an overview of the trial. The Government called three witnesses: (1) Steve Green, a digital forensic specialist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who processed several audio and video recordings introduced as trial evidence (Trial Tr. ("Tr.") 444–463); (2) Seetaram Ganisetti, the alleged victim of the murder-for-hire plot and uncle of Bhogireddy's wife, who testified about Bhogireddy's divorce proceedings (Tr. 1168–1183); and (3) Special Agent Andrew Karceski of the ATF, the agent assigned to the undercover operation centered on Bhogireddy who posed as a hitman (Tr. 512–1167). Bhogireddy did not

testify or call any witnesses. Because Karceski alone communicated with Bhogireddy regarding the murder plot, his testimony was the focus of the Government's theory and evidence. Notably, the Government entered into evidence recordings of most conversations between Bhogireddy and Karceski, as well as exhibits showing their text messages.[1] As a result, the jury was able to observe the content and tone of the communications, including hearing Bhogireddy's statements to Karceski for themselves rather than having to rely solely on Karceski's testimony about what was said and the manner in which they said it. The following summarizes the trial evidence.[2]

On May 13, 2019, Karceski received a call from a detective with the Will County Sheriff's Department, who directed him to a confidential source identified as "Tom." (Tr. 517–18, 713.) After talking with Tom, Karceski understood that an individual named Venkatesh Bhogireddy was seeking a hitman for a potential murder-for-hire scheme. (Tr. 518, 713.) Karceski directed Tom to call Bhogireddy and let him know that Tom had "found a guy" and to give Bhogireddy Karceski's contact information. (Gov. Ex. 1.)

After Bhogireddy failed to meet at Tom's workplace on May 14, 2019, as promised, Tom called Bhogireddy again on June 4.[3] (Def. Ex. 1; Gov. Ex. 1; Tr. 526, 710–11.) That same day, Bhogireddy called Karceski, requesting that he meet Karceski in-person to discuss a "quote." (Gov Ex. 2, 00:36–01:00; Tr. 526–27.) Karceski presented himself using his undercover identity, "Joe," a member of a local motorcycle gang who worked at a motorcycle repair shop. (Tr. 529, 685–86, 689–90.)

---

[1] Unless otherwise noted, Karceski created audio or video recordings of all his phone conversations and in-person meetings with Bhogireddy. (Government Exhibit ("Gov. Ex.") 1–17, 22–23, 27–38, 50.)

[2] Because Bhogireddy was found not guilty of Count Three, the Court does not discuss it or its corresponding facts further.

[3] Karceski failed to record this call. (Tr. 526.)

Having arranged the time and place earlier in the day (Gov. Ex. 3, 00:20–1:08; Gov. Ex. 4, 00:10–00:52), Karceski and Bhogireddy met on June 6, 2019 at an undercover ATF warehouse to talk. (Gov. Ex. 5; Tr. 537.)[4] During the conversation, Bhogireddy told Karceski about his ongoing divorce proceedings involving his wife, Usha Karri. (Gov. Ex. 5, 03:40–04:35; Tr. 542–43.) Bhogireddy believed that his wife's uncle, Ganisetti, was convincing his wife to do "a lot of stupid things" in their ongoing divorce proceedings. (Gov. Ex. 5, 03:40–04:35; Tr. 542–43.) As a result, Bhogireddy wanted "to do something," and he stated that he wanted Ganisetti "taken care of." (Gov. Ex. 5, 05:10–05:58; Tr. 543.) In response, Karceski sought clarification on whether it was "her or him" that Bhogireddy wanted taken care of, referring to Karri or Ganisetti. (Gov. Ex. 5, 05:15–05:24; Tr. 543–45.) Bhogireddy stated that he did not want Karceski to do anything to Karri because he was worried about looking guilty while his divorce proceedings were ongoing. (Gov. Ex. 5, 05:10–05:58, 13:55–14:18, 16:30–16:41; Tr. 543, 550.) Bhogireddy further noted that he had already talked with his father, a police officer in India, about his plan "to do something" to his wife later on. (Gov. Ex. 5, 05:22–05:49.) Karceski made clear that he understood Bhogireddy's intentions, stating that "just so [the two were] clear," Bhogireddy did not want Karceski to beat up Ganisetti, but rather wanted Ganisetti "gone." (Gov. Ex. 5, 05:58–06:08; Tr. 543–45.) Bhogireddy agreed. (Gov. Ex. 5, 05:58–06:08; Tr. 543–45.)

Approximately two minutes later, when Karceski asked if Bhogireddy wanted to "hurt" or "kill" Ganisetti, Bhogireddy stated that he "did not know" and preferred that Ganisetti be put in a coma. (Gov. Ex. 5, 07:58–08:15; Tr. 545.) Karceski told Bhogireddy that putting Ganisetti in a coma would be difficult to do, to which Bhogireddy responded that Karceski should deal with

---

[4] At trial, Bhogireddy disputed the reliability of the June 6 audio recording and corresponding transcript due to the quality of the recording and Bhogireddy's accent. (*See* Order on Mot. *in Limine* at 3–4, Dkt. No. 147.)

Ganisetti "the other way." (Gov. Ex. 5, 08:10–08:15; Tr. 545–46.) Bhogireddy further commented that he wanted Karceski's treatment of Ganisetti to look like an "accident" or a "hate crime." (Gov. Ex. 5, 08:35–08:50.) Bhogireddy told Karceski that before the meeting, he had researched using a large dose of insulin to make Karri pass away in her sleep or, in Bhogireddy's words, make her "gone." (Gov. Ex. 5, 16:50–17:29; Tr. 551.) Bhogireddy noted that authorities would be unable to blame Bhogireddy because insulin is "untraceable" in an individual's system after a period of time. (*Id.*) As further context to their conversation, Karceski testified that Bhogireddy's failure to use terms like "kill" and "murder" did not indicate to him that Bhogireddy did not intend to murder Ganisetti, as the use of code words is common in criminal enterprises. (Tr. 548.)

As their conversation ended, Bhogireddy and Karceski discussed purchasing cell phones apart from their current cell phones—which they termed "drop phones"—on which to communicate. (Tr. 546–47.) Karceski testified that the use of anonymous cell phones or "drop phones" was a part of his undercover persona, as he believed that criminals used such devices to avoid detection by law enforcement. (Tr. 546–47.) Bhogireddy agreed to pay Karceski $8,000 in total, with $1,000 allotted for Karceski to travel to New Jersey, where Ganisetti lived, to surveil him. (Gov. Ex. 5, 09:56–10:20, 13:30–13:54; Tr. 549–50.) Before Bhogireddy left their meeting, Karceski told Bhogireddy that "this is on you" and asked Bhogireddy to let him know when he should act. (Gov. Ex. 5, 24:40–24:46; Tr. 566–67.)

On June 18, 2019, Karceski called Bhogireddy, and Bhogireddy informed him that he had gotten a "drop phone" that he was going to activate. (Gov. Exh. 6, 00:00–00:30.) On July 1, 2019, at approximately 2:56 PM, Bhogireddy called Karceski to give Karceski his new phone number and to plan to meet that night. (Gov. Ex. 7, 00:00–01:11; Tr. 572.) The same day, at

approximately 5:59 PM, Bhogireddy called Karceski to reschedule for the following day, July 2. (Gov. Ex. 8, 00:00–00:32; Tr. 572.)

On July 2, Bhogireddy and Karceski met. (Gov. Ex. 17; Tr. 572–80.) Bhogireddy gave Karceski $1,500 in cash, photos of Ganisetti, and Ganisetti's home address. (Tr. 587, 597.) Bhogireddy also instructed Karceski to surveil Ganisetti, so that Bhogireddy and Karceski could plan further.[5] (Gov. Ex. 17, 12:50–18:17; Gov. Ex. 18–21; Tr. 585.) During the meeting, Bhogireddy expressed some reticence about the plan, noting that although he wanted to "take care" of Ganisetti, who was a "problem," Ganisetti had small children and Bhogireddy felt some guilt. (Gov. Ex. 17, 10:20–12:35; Tr. 584–85.) While Bhogireddy confirmed that he wanted "something done" to both Karris and Ganisetti (Gov. Ex. 17, 18:41–19:01; Tr. 588), he also asked Karceski, "What if I don't know, I don't want you to take him out but something else," and, "What if I changed my mind?" (Tr. 843, 855). Bhogireddy further stated that he wanted Ganisetti "gone or something." (Tr. 853.) Karceski offered to make Ganisetti's death look like a robbery gone bad, a suggestion that Bhogireddy rejected. (Gov. Ex. 21:52–28:29; Tr. 589.) Bhogireddy agreed to pay Karceski even if he ended up changing his mind. (Tr. 847.)

After Karceski and Bhogireddy exchanged text messages and phone calls on July 15 and 16, 2019, Karceski confirmed he was driving to New Jersey to surveil Ganisetti. (Def. Ex. 1; Gov. Ex. 22, 00:05–00:56; Tr. 890–91.) On July 22, 2019, at approximately 5:16 PM, Karceski called Bhogireddy from New Jersey near Ganisetti's home. (Gov Ex. 23; Tr. 603–05.) During that conversation, Bhogireddy indicated that Karceski should surveil where Ganisetti went, noting that Ganisetti worked from home but "sometimes" went into work in-person in New York

---

[5] At trial, Ganisetti testified that the photos were indeed him and that the home address was accurate. (Tr. 1171–73.)

City. (Gov. Ex. 23, 00:00–02:45; Tr. 904.) Bhogireddy also said that once Karceski was back from New Jersey, the two could plan. (Gov. Ex. 23, 00:00–02:07; Tr. 603–04.) On July 24, 2019, Bhogireddy called Karceski, and Karceski confirmed that he was leaving New Jersey to return to Illinois. (Gov. Ex. 27, 00:00–00:28; Tr. 617–18.)

Between July 28, 2019 and August 26, 2019, through phone calls and text messages, Bhogireddy and Karceski planned to meet on August 26. (Def. Ex. 1; Gov. Ex. 28–30; Tr. 620–21, 906–19.) That day, the two met at the ATF warehouse to discuss Karceski's surveillance of Ganisetti. (Gov. Ex. 33; Tr. 622–23, 920–21.) Bhogireddy asked whether Karceski had observed Ganisetti leaving the house, and Karceski confirmed he had but he had not seen Ganisetti get on a train to commute to work. (Gov. Ex. 33, 02:45–03:04; Tr. 624–25.) Karceski then told Bhogireddy that he "could have did it right then and made it look like a robbery." (Gov. Ex. 33, 03:04–03:29; Tr. 627.)

The two discussed Bhogireddy's divorce proceedings. (Tr. 630.) Bhogireddy stated several times that he wanted "to do something" to Ganisetti, and further explained, "I want to do them both, I want to do him first, and then I want to do her." (Gov. Ex. 33, 03:53–04:51; Tr. 630, 956–57.) Bhogireddy expressed that he wanted to wait until after his upcoming court appearance to do "something" to Ganisetti. (Gov. Ex. 33, 08:18–10:15; Tr. 631.) Bhogireddy further suggested that Karceski "take [Ganisetti] off or beat him to a pulp." (Tr. 944–45.) Bhogireddy later expressed that he was so mad at Ganisetti that he wanted to do "it" with his own hands—for instance, by taking a stick to break all Ganisetti's bones. (Tr. 961–63.) At various points, Bhogireddy asked Karceski what he thought Bhogireddy should do. (Tr. 941, 944–45.) Karceski repeatedly stated that it was up to Bhogireddy what he wanted Karceski to do. (Tr. 941, 944–46.)

6

Karceski twice asked for his portion of the promised price upfront, which Bhogireddy confirmed. (Tr. 947, 963.)

Between August 26, 2019 and September 26, 2019, the two texted and called back and forth, delaying their meeting due to Bhogireddy's court hearing and, later, his arrest. (Def. Ex. 1; Tr. 968–96.) The two finally agreed to meet on October 2, 2019. (Def. Ex. 1; Tr. 984–96.) On October 2, at approximately 6:32 PM, Bhogireddy called Karceski, stating that he was at the warehouse waiting for him.[6] (Tr. 639–40.) Rather than meet in the ATF warehouse, the two met at a nearby restaurant, as Karceski was already there and feigned sending away his girlfriend. (Gov. Ex. 36, at 00:00–00:59; Gov. Ex. 37, 00:00–00:29; Tr. 640–44.)

Bhogireddy approached Karceski at a table outside the restaurant and immediately gave him $2,000 in cash. (Gov. Ex. 38, 26:17–26:22; Tr. 648.) Bhogireddy told Karceski that after consulting with his father, he wanted "it" to look like an accident and advised Karceski against using a gun. (Gov. Ex. 38, 26:22–27:30; Tr. 648–49.) When Karceski asked whether "accident" meant "dead," Bhogireddy replied, "Yes." (Gov. Ex. 38, 26:22–26:44; Tr. 648–49.) Bhogireddy further stated that it did not have to be "dead," as "crash is good enough," to which Karceski responded, "It's probably going to be dead." (Tr. 1069–70.) Bhogireddy agreed but emphasized for Karceski to take his time. (Gov. Ex. 38, 27:30–27:45; Tr. 648–49.) Bhogireddy even agreed to pay more money if needed. (Tr. 649–50.) When Karceski asked if he was "good to go" once he went to New Jersey and saw an opportunity, Bhogireddy confirmed, "Yes." (Gov. Ex. 38, 31:30–31:38; Tr. 650.) The two then discussed throwing away their drop phones. (Gov. Ex. 38, 33:50–34:10; 40:40–41:05; Tr. 650–51.)

---

[6] Karceski failed to record this phone call, as he did not expect that Bhogireddy would appear at that time at the ATF warehouse. (Tr. 639–40.)

Later in the conversation, Karceski suggested to Bhogireddy that Karceski could push Ganisetti in front of a train, to which Bhogireddy responded that they needed to know if Ganisetti was going to New York such that he would be near a train. (Gov. Ex. 38, 35:10–35:20; Tr. 665–67.) Karceski commented, "I mean, if he's getting on the subway in New York City, shit happens every day," to which Bhogireddy responded, "Not that he goes there." (Tr. 1030–31.) Karceski closed the conversation by noting that the next time Bhogireddy would hear from him, "it would be over." (Gov. Ex. 38, 42:50–42:57; Tr. 670.) Bhogireddy walked towards the nearby parking lot but returned to the table to tell Karceski the "train thing is good," and Karceski confirmed that he would get some "crazy guy" to do it, (Gov. Ex. 38, 43:48–44:12; Tr. 671–72, 1028.)

At the close of the Government's evidence, Bhogireddy moved for a judgment of acquittal pursuant to Rule 29 and a new trial pursuant to Rule 33. (Tr. 1193, 1424.) The Court deferred ruling on both motions. The jury subsequently found Bhogireddy guilty of five of six counts: Counts One, Two, Four, Five, and Six. After the trial concluded and the parties filed their initial post-trial briefing, Bhogireddy filed a motion to substitute counsel, which the Court granted. (Dkt. No. 182–183.) New counsel then had an opportunity to review the record and supplement its post-trial briefs. (Dkt. No. 185, 206.) The motions, as supplemented, are therefore fully briefed and ripe for ruling.

## LEGAL STANDARD

Bhogireddy has filed post-trial motions under both Rules 29 and 33. Rule 29 requires the Court to enter a judgment of acquittal where the evidence presented at trial "is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *see also United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019) (internal quotation marks omitted). A defendant seeking a judgment of acquittal faces "a heavy, indeed, nearly insurmountable burden," and courts will "reverse [a jury

verdict] only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Moreno*, 922 F.3d at 793 (internal quotation marks omitted and cleaned up). In considering a motion for judgment of acquittal, the Court must "afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor." *United States v. Brown*, 973 F.3d 667, 681 (7th Cir. 2020).

Bhogireddy also seeks a new trial under Rule 33. Under this Rule, on the defendant's motion, the Court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The "interest of justice" may require a new trial "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during the trial." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) (internal quotation marks omitted). Nonetheless, the power to overturn a jury verdict is one "reserved for only the most extreme cases." *Id.* (internal quotation marks omitted). "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985)). Rather, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* Rule 33 requires a new trial "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (internal quotation marks omitted).

## DISCUSSION

Bhogireddy argues that various trial errors require that the jury's verdict be vacated and a new trial ordered. Alternatively, Bhogireddy contends that he is entitled to a judgment of acquittal because the Government failed both to prove his guilt beyond a reasonable doubt or to

disprove an element of the instructed entrapment defense. The Court will first consider whether any purported trial errors necessitate a new trial before turning to the sufficiency of the evidence and the requirements of the instructed entrapment defense.

## I.      Motion for a New Trial

In his motion for a new trial, Bhogireddy argues that the Court's imposition of certain COVID-19 safety procedures and various other trial errors entitle him to a new trial.[7] The Court finds Bhogireddy's arguments unpersuasive and accordingly denies his motion.

### A.      COVID-19 Health and Safety Procedures

Bhogireddy first complains that the Court's COVID-19 health and safety procedures denied him a fair trial. Accordingly to Bhogireddy, he was prevented from sitting at counsel table during the trial, in violation of his Sixth Amendment right to counsel, and that witnesses were required to wear masks, which prevented the jury from properly judging each witness's credibility in violation of his due process rights. As confirmed by the record, however, Bhogireddy's version of events is simply inaccurate.

During the two-day final pretrial conference, the Court twice advised that Bhogireddy could sit at counsel table with his attorney. (Pretrial Conf. on May 10, 2021 at 2–7, Dkt. No. 190; Pretrial Conf. on May 17, 2021 at 21–28, Dkt. No. 191.) Defense counsel confirmed on the record that Bhogireddy would do so. (Pretrial Conf. on May 10, 2021 at 5; Pretrial Conf. on May 17, 2021 at 27.) Accordingly, Bhogireddy could "communicate with counsel" and was not deprived of his Sixth Amendment right to counsel. *See Illinois v. Allen*, 397 U.S. 337, 344 (1970)

---

[7] Bhogireddy additionally argues in support of his request for a new trial that the Government did not present evidence sufficient to prove its case beyond a reasonable doubt. As he incorporates and expounds upon this argument in his motion for a judgment of acquittal, the Court will address Bhogireddy's argument in connection with its discussion of that motion.

(noting that the right to effective assistance of counsel includes a defendant's "ability to communicate with counsel"). Further, as discussed in this Court's order ruling on Bhogireddy's motions *in limine*, at the pretrial conference, and during trial, the Court requested that witnesses remove their masks when testifying and each witness did so. (Order on Mot. *in Limine* at 2, Dkt. No. 147; Pretrial Conf. on May 17, 2021 at 18; Tr. 14, 273–74.) Witnesses were only required to wear masks while moving throughout the courthouse, as they walked to the witness stand before testifying, and as they walked away from the witness stand after testifying. As a result, the jury could readily evaluate the witness's demeanor during their testimony to make credibility determinations. *See Maryland v. Craig*, 497 U.S. 836, 846 (1990) (noting that physical confrontation aids the jury in assessing a witness's credibility). Accordingly, Bhogireddy's due process rights were not violated.

Bhogireddy further argues that the requirement that he wear a mask in the courtroom deprived him of his Sixth Amendment right to confront witnesses and to confer with his counsel. The Court rejects both arguments. First, Bhogireddy's right to confront witnesses was not violated by the fact that he was required to wear a mask during the witnesses' testimony. A defendant's right to physical confrontation must give way when it "is necessary to further an important public policy and . . . where the reliability of the testimony is otherwise assured." *See Craig*, 497 U.S. at 850. Both of these requirements were met. At the time of Bhogireddy's trial, the Northern District of Illinois had instituted health and safety measures in furtherance of the important public policy of reducing the spread of COVID-19.[8] *See* COVID-19 Public Emergency

---

[8] Bhogireddy argues that Illinois Executive Order 2021-10, which adopted then-current guidelines from the Centers for Disease Control and Prevention, allowed fully vaccinated persons not to wear masks indoors, making the Court's masking requirement erroneous. However, the Executive Order exempts the United States government from its requirements and thus is inapplicable. *See* Ill. Exec. Order. No. 2021-10 (COVID-19 Executive Order No. 79) (May 17, 2021).

Order Concerning Face Masks, Amended Order (N.D. Ill. Feb. 18, 2021),
http://www.ilnd.uscourts.gov/_assets/_documents/_forms/_clerksoffice/rules/admin/pdforders/C
A7%20%20NDIL%20Order%20Amending%20Face%20Coverings%20Signed.pdf. The Court
ensured that witness testimony was reliable by requiring that it was presented in court and
developed by cross-examination. *See Craig*, 497 U.S. at 846. And as noted above, the witnesses
themselves were not required to be masked while testifying. Because the Court's masking policy
furthered an important public policy and did not compromise the reliability of witness testimony,
the policy fits within the public policy exception of the Confrontation Clause and accordingly did
not violate the Sixth Amendment. *Id.* at 850; *see also United States v. Tagliaferro*, 531
F.Supp.3d 844, 849–50 (S.D.N.Y. 2021) (holding that the district's requirement that the
defendant remain masked for his trial did not violate his Sixth Amendment confrontation right).

Bhogireddy's right to confer with his counsel was also not violated by the Court's
masking policy. As noted above, Bhogireddy sat at counsel table next to his attorney throughout
trial. From that position, he had the ability to confer with his counsel. The Court finds that
Bhogireddy's right to counsel was not impaired and notes that Bhogireddy fails to cite any
applicable caselaw holding that a requirement that a defendant be masked during trial prevents
him from effectively communicating with his counsel. Thus, the Court rejects Bhogireddy's
argument.

Finally, Bhogireddy contends that he and his counsel were unable "to determine how the
jury was receiving the testimony and evidence" because jurors were masked, thereby depriving
him of his due process rights. The Court disagrees. As a preliminary matter, as with testifying
witnesses, the Court requested that jurors temporarily remove their masks when responding to
questions during voir dire. Accordingly, Bhogireddy and his counsel had an opportunity to view

the jurors faces as they addressed issues related to their qualifications to serve on the jury. And just as the Court noted in its earlier ruling on Bhogireddy's motions *in limine*, Bhogireddy has failed to cite any authority that would require Bhogireddy or his counsel be able to assess the unmasked faces of jurors while they listened to the trial testimony and argument. (Order on Mot. *in Limine* at 2.)[9] As such, the Court rejects both arguments related to the implementation of courtroom procedures to address the COVID-19 pandemic.

### B. Evidentiary Errors at Trial

Bhogireddy next argues that several of the Court's evidentiary rulings were erroneous and thus entitle him to a new trial. The Court disagrees.

Bhogireddy first contends that the Court erred in admitting his statements that he intended to kill Karri in the future because those statements constituted improper character evidence under Federal Rule of Evidence 404(b).[10] Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). However, such evidence may be used for limited purposes, including to prove intent or motive, if the Government gives "reasonable notice" of such evidence. *Id.* Relevant here, evidence of a

---

[9] Similarly, Bhogireddy seems to imply that his trial counsel was rendered ineffective by jurors wearing masks, but he does not support this contention with case law or otherwise expand on why such a requirement violated his right to a fair trial. *See United States v. Adams,* 625 F.3d 371, 378 (7th Cir. 2010) (failing to develop argument in any meaningful way waives that argument).

[10] Bhogireddy also argues, albeit somewhat obliquely, that this evidence was unduly prejudicial under Federal Rule of Evidence 403. (Reply to Mot. for New Trial at 3, Dkt. No. 173.) Because Bhogireddy failed to make this argument until his reply brief and failed to develop this the argument past conclusory statements, the Court deems it waived. *See Adams*, 625 F.3d at 378; *see also Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012) (holding that arguments raised for the first time in a reply brief are generally waived). In any case, it would be denied on the merits, as any potential for undue prejudice did not outweigh the probative value of the testimony.

defendant's motive to commit a crime is relevant because it tends to make it more likely that he committed the crime. *United States v. Lloyd*, 71 F.3d 1256, 1264 (7th Cir. 1995).

For purposes of his trial, Bhogireddy's statements were admissible as evidence of his intent or motive, as they tended to show why he would seek to murder his wife's uncle rather than his wife herself. The Government consistently argued as much throughout trial. For instance, in its closing argument, the Government argued that Bhogireddy "was going through a difficult divorce" and that although "[h]e wanted to take care of his wife  . . . if he did anything to his wife, he would be the prime suspect." (Tr. 1315.) Thus, according to the Government, Bhogireddy "decided that he would kill Mr. Ganisetti" because he "was providing support to [Bhogireddy's] wife in the form of financial support, emotional support and talking," (*Id.*)

Bhogireddy's contention that the Government failed to provide proper notice of its intent to use the evidence under Rule 404(b) fares no better. As the Court noted at the final pretrial conference, defense counsel had ample notice of the Government's arguments (Pretrial Conf. on May 17, 2021 at 49), and in any case, Bhogireddy failed to make the argument until his reply brief and thus has waived the issue (*See* Reply to Mot. for New Trial at 3). *See Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012) (noting that arguments raised only in a reply brief are generally waived). The Court finds no error in the admission of Bhogireddy's statements.

Finally, Bhogireddy contends that the Court should not have admitted the June 6 recording because he believes portions were so unintelligible as to render the entire recording untrustworthy and inadmissible. However, "recordings that are partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the entire recording untrustworthy." *United States v. Larkins*, 83 F.3d 162, 167 (7th Cir. 1996). Here, while some portions of the June 6 recording are difficult to understand, having reviewed the recording, the

Court finds the recording sufficiently intelligible and understandable, such that it was appropriate for the jury hear it and determine how much weight to afford it. *Id.* Further, Bhogireddy's suggestion that the transcript of the June 6 recording should have been barred is meritless. The Court instructed the jury several times throughout the trial that the transcript of the June 6 meeting was only used as a demonstrative aid, not evidence. (Tr. 1304.)

In sum, Bhogireddy has not identified any errors warranting a new trial. Because the Court's COVID-19 masking policy did not violate Bhogireddy's constitutional rights and the Court did not err in admitting the aforementioned evidence, the Court denies Bhogireddy's motion for new trial.

## II.     Motion for a Judgment of Acquittal

With his motion for a judgment of acquittal, Bhogireddy challenges the sufficiency of the evidence against him for Counts One, Two, Four, Five, and Six. Specifically, he contends that the Government did not present sufficient evidence to establish beyond a reasonable doubt that he had the necessary intent that a murder be committed. Additionally, Bhogireddy argues that the Government failed to prove that he was either predisposed to commit the charged crimes or that the Government did not induce him to do so, as required by the instructed entrapment defense. The Court addresses each argument in turn.

### A.     Sufficiency of the Evidence

#### 1.     Counts One and Two

Counts One and Two charged Bhogireddy with murder-for-hire, in violation of 18 U.S.C. § 1958(a), based on his calls to Karceski at approximately 2:56 PM on July 1, 2019 (Count One) and later that day at approximately 5:59 PM (Count Two). Because the calls were close in time and the same evidence applies for both, the Court considers the counts together.

To prove that Bhogireddy violated 18 U.S.C. § 1958(a), the Government must show that "(1) the defendant knowingly used or caused another to use a facility of interstate commerce, (2) the facility of interstate commerce was used with the intent that a murder be committed in violation of state law, and (3) something of pecuniary value was promised or agreed to be paid in consideration for the murder." *United States v. Mandel*, 647 F.3d 710, 717 (7th Cir. 2011). The Government need not prove "an actual murder-for-hire agreement," only that Bhogireddy "had the ***intent*** that a murder-for-hire be committed." *United States v. Caguana*, 884 F.3d 681, 688 (7th Cir. 2018) (emphasis in original).

With respect to the jury verdicts against him as to Counts One and Two, Bhogireddy argues that he did not have the intent to murder Ganisetti, only intent to batter him. He observes that the evidence regarding his initial June 6 meeting with Karceski indicated that he stated only that he wanted Ganisetti put in a "coma;" he did not say he wanted Ganisetti murdered and, when Bhogireddy and Karceski met on July 2, the two planned only to surveil Ganisetti in New Jersey.

But while Bhogireddy highlights the evidence that he believes suggests his innocence, the Court must review the evidence in the light most favorable to the Government and make all reasonable inferences in the Government's favor. Doing so, it is clear that there was sufficient evidence for a rational jury to find Bhogireddy guilty beyond a reasonable doubt as to each of Counts One and Two. The evidence showed that, after stating that he was seeking a "quote" from Karceski during their initial telephone call, Bhogireddy detailed that he wanted Ganisetti "taken care of." (Gov Ex. 2, 00:36–01:00; Gov. Ex. 5, 05:10–05:58; Tr. 526–27, 543.) Bhogireddy agreed that he did not want Karceski to beat up the uncle but rather desired him "gone." (Gov. Ex. 5, 05:58–06:08; Tr. 543–45.) Similarly, when Karceski told Bhogireddy that putting Ganisetti in a coma might be difficult, Bhogireddy suggested "the other way," a statement which

the jury reasonably could conclude expressed Bhogireddy's intent that Karceski murder Ganisetti. (Gov. Ex. 5, 08:10–08:15; Tr. 545–46.) Indeed, Bhogireddy expressly noted that he wanted Karceski's treatment of Ganisetti to look like an "accident" or "hate crime," he had already researched how to murder someone with insulin, and he had talked to his father, a police officer in India, about his intentions. (Gov. Ex. 5, 08:35–08:50.) Bhogireddy also agreed to get an anonymous cell phone and to pay Karceski $8,000 for his services. Bhogireddy later activated his anonymous "drop phone," gave Ganisetti's personal information to Karceski, and planned another meeting with Karceski to discuss their plans. While Bhogireddy may have expressed reluctance about whether to harm Ganisetti during his conversations with Karceski on June 6 and July 2, Bhogireddy nonetheless indicated at both meetings that he wanted to have Ganisetti "take[n] care" of, as he was a "problem." (Gov. Ex. 5, 05:10–05:58; Gov. Ex. 17, 10:20–10:38, 12:00–12:35; Tr. 543, 584–85.) Considered as a whole, the Government presented sufficient evidence such that a rational jury could find Bhogireddy guilty of Counts One and Two.

In arguing to the contrary, Bhogireddy asks that the Court listen to the recordings of various meetings to hear statements Bhogireddy allegedly made but which do not appear in the Government's transcript, supposedly due to Bhogireddy's accent and background noise. At the outset, the Court notes that the jury did not rely on the Government's transcripts as Bhogireddy suggests. Rather, the Court instructed the jury after the close of evidence that the transcripts were not evidence and, moreover, if the jury could not understand certain parts of the record, they were required to "ignore the transcripts as far as those parts are concerned." (Tr. 1304–05.) Bhogireddy has provided no basis to doubt that the jury followed the Court's instructions. *See United States v. Garcia*, 81 F.4th 691, 698 (7th Cir. 2023) (explaining the rebuttable presumption that the jury follows the court's jury instructions). Only the recordings of Karceski's

conversations with Bhogireddy were evidence that the jury was tasked with weighing. (*Id.*) As noted above, the Court found that the tape recordings in this case were sufficiently intelligible such that the jury could hear them and give them appropriate weight, as the Court presumes the jury did. *Larkins*, 83 F.3d at 167.

Bhogireddy further argues that Karceski, who testified about the contents of his conversations with Bhogireddy as the only other participant in them, was not a credible witness. As a result, Bhogireddy contends, the jury could not reasonably rely on Karceski's interpretation of Bhogireddy's coded language and intentions for Ganisetti. The Court is not persuaded by Bhogireddy's argument.

To begin, the Court rejects Bhogireddy's contention that his and Karceski's use of coded or veiled language fails to amount to proof beyond a reasonable doubt as a matter of law. The Seventh Circuit has noted that a defendant's use of "code language" that "clearly imparts their intentions while hoping to hide their meaning from law enforcement" does not preclude prosecution under § 1958(a). *United States v. Gibson*, 530 F.3d 606, 610 (7th Cir. 2008). This makes sense, as criminals often try to evade detection by law enforcement and thus are unlikely to state their intentions directly. *Id.* (noting that individuals in a murder-for-hire scheme are unlikely to "make things as clear as businessmen might" as "[t]hey are trying not to get caught"). Thus, Bhogireddy's use of coded language in his conversations with Karceski does not preclude his conviction under § 1958.

Bhogireddy cites the Seventh Circuit's decision in *United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019), as support for his claim that Karceski's interpretation of his coded language is not sufficient proof beyond a reasonable doubt. But *Garcia* is readily distinguishable. There, the defendant was found guilty of drug distribution solely based on expert testimony interpreting the

defendant's coded language on recorded calls as meaning he had distributed a certain amount of cocaine. *Id.* at 503–04. The Government presented no direct evidence of drug distribution, as law enforcement had not found any narcotics in defendant's car or home. *Id.* at 493–94. The Seventh Circuit held that the defendant's "cryptic conversations, filtered through an agent's experience with other, unrelated cases without any corroboration that [defendant] was actually trafficking in cocaine, were not sufficient to support a criminal conviction." *Id.* at 504.

This case is quite different. Karceski testified that individuals involved in criminal schemes, such as murder-for-hire plots, avoid using explicit language to avoid detection by law enforcement. (Tr. 548.) He interpreted Bhogireddy's use of coded language such as "gone" or "taken care of," in place of more direct language such as "kill" or "murder," as indicating that Bhogireddy wanted Ganisetti to be murdered. (*Id.*) Unlike *Garcia*, however, this case involved abundant direct evidence that Bhogireddy wanted Ganisetti to be murdered. Apart from the suggestive language that Karceski and Bhogireddy used, the evidence showed that Bhogireddy paid Karceski $3,500 to surveil and do "something" to Ganisetti, provided Ganisetti's photo and location to Karceski, and furnished Karceski with information about Ganisetti's commuting patterns. *See United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) ("A verdict may be rational even if it relies solely on circumstantial evidence."). While Bhogireddy and Karceski did not explicitly state that Karceski planned to kill Ganisetti, it is not unreasonable to interpret it as such, given the evidence presented at trial.

More importantly, the jury is tasked with making credibility determinations, to which this Court ordinarily must defer. *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (explaining that, in reviewing a Rule 29 motion, a district court must "defer to the credibility determination of the jury"); *see also United States v. Green*, 648 F.3d 569, 578 (7th Cir.

2011) (stating that a court will "overturn a conviction based on a credibility determination only if the witnesses' testimony was incredible as a matter of law"). Bhogireddy had an opportunity to attack Karceski's credibility during the trial through cross-examination. Despite those efforts and faced with competing interpretations of Bhogireddy's intentions for Ganisetti, one of which came directly from a participant in the conversation, the jury was entitled to decide that Karceski's understanding was more credible. The jury was not required to credit the more innocent explanation offered by Bhogireddy's counsel. This is especially true given that the majority of the conversations between Bhogireddy and Karceski were recorded and presented to the jury. There is no reason for this Court to second guess the jury's credibility determination. *Blassingame*, 197 F.3d at 284.

In sum, there was sufficient evidence from which the jury could conclude that Bhogireddy was guilty beyond a reasonable doubt of Counts One and Two, and accordingly, Bhogireddy's motion for a judgment of acquittal as to those counts is denied.

### 2.     Counts Four and Five

Counts Four and Five charged Bhogireddy with murder for hire, in violation of 18 U.S.C. § 1958(a), based upon Bhogireddy having Karceski travel to New Jersey on July 22, 2019 to surveil Ganisetti (Count Four) and calling Karceski on July 22, 2019 at approximately 5:16 PM (Count Five). For these counts, Bhogireddy again argues that the Government did not present sufficient evidence to establish beyond a reasonable doubt that he intended to murder Ganisetti when Karceski travelled to New Jersey to surveil Ganisetti and when Bhogireddy called Karceski on July 22, 2019. As with Counts One and Two, because Counts Four and Five largely rest on the same evidence, the Court discusses them together.

In addition to the evidence described above, the Government introduced evidence at trial showing that Bhogireddy called Karceski to confirm that he was travelling to New Jersey. Once

in New Jersey, Bhogireddy indicated that Karceski should surveil where Ganisetti went, noting that Ganisetti worked from home but "sometimes" went into work in-person in New York City. (Gov. Ex. 23, 00:00–02:45; Tr. 904.) The evidence also showed that Bhogireddy said once Karceski was back from New Jersey, the two could plan more.

While neither man stated explicitly that Karceski would be surveilling Ganisetti for the purpose of murdering him, Bhogireddy gave Karceski information about how to find Ganisetti and indicated that seeing his path would be "lucky," as it would guarantee access to him. (Def. Ex. 1; Tr. 904–05.) Karceski testified that he interpreted Bhogireddy's direction for him to surveil Ganisetti as being in furtherance of a plan to murder Ganisetti. (Tr. 604.) And as noted previously, Bhogireddy's use of veiled language does not preclude a finding that he intended that a murder be committed. *Gibson*, 530 F.3d at 610. To the contrary, given the totality of the circumstances, it was reasonable for the jury to credit Karceski's interpretation of Bhogireddy's statements and find that he intended that Ganisetti be murdered.

Much like his argument regarding Counts One and Two, Bhogireddy contends that the Court should interpret recorded conversations as showing that Bhogireddy only intended to harm, not kill, Ganisetti. However, no trial witness testified in support of the interpretation that Bhogireddy urges this Court to adopt. While defense counsel argued at trial that the recordings should be interpreted in that manner, argument is not evidence and the jury was entitled to draw a different conclusion. Presented with conflicting interpretations of the recorded conversations between Bhogireddy and Karceski, the jury was persuaded that Karceski's interpretation was correct. This conclusion was not erroneous as a matter of law.

In sum, there was sufficient evidence from which the jury could find Bhogireddy guilty beyond a reasonable doubt of the crimes alleged in Counts Four and Five. The Court accordingly denies Bhogireddy's motion for a judgment of acquittal as to those counts.

### 3.      Count Six

Count Six charged Bhogireddy with murder for hire, in violation of 18 U.S.C. § 1958(a), based on his call to Karceski at approximately 6:32 PM on October 2, 2019. Once again, Bhogireddy contends that the trial evidence was insufficient to show beyond a reasonable doubt that he committed this offense with the requisite intent. As with the other counts, Bhogireddy's argument is unavailing.

In addition to the evidence described above, the jury could rely on the evidence regarding the August 26 and October 2 meetings with Karceski as evidence of Bhogireddy's intent that a murder be committed. It is true that Bhogireddy displayed some reluctance about the scheme during his meeting with Karceski on August 26. Yet each time Bhogireddy asked Karceski what he should do, Karceski left it up to Bhogireddy. (Tr. 944–46.) And rather than back away from the murder plan, Bhogireddy stated several times that he wanted "to do something" to Ganisetti, noting, "I want to do them both. I want to do him first, and then I want to do her." (Gov. Ex. 33, 03:53–04:51; Tr. 630, 956–57.) Bhogireddy even declared that he wanted to do "it" with his own hands. (Tr. 961–62.) Further, despite delays in late August and September 2019, Bhogireddy continued to reach out to Karceski to plan more meetings throughout that period. Finally, on October 2, 2019, immediately after the call charged in Count Six, Bhogireddy agreed that he wanted Ganisetti "dead," confirmed that Karceski was "good to go," instructed him to make "it" look like an accident, and approved a plan to push Ganisetti in front of a train. (Gov. Ex. 38, 26:22–44:12; Tr. 648–50.) Bhogireddy also provided more money and agreed to throw away his

anonymous cell phone after Karceski was finished. From this evidence, a reasonable jury could find Bhogireddy guilty beyond a reasonable doubt of the crime charged in Count Six.

Bhogireddy claims that he had obtained better custody terms for his minor children on August 2, 2019 and therefore no longer had any motive to kill Ganisetti. As evidence, Bhogireddy points out that he increasingly made excuses to put off meeting with Karceski in late August and early September 2019, which he claims shows that he had no intention of killing Ganisetti and was merely putting off a persistent hitman. But while Bhogireddy advocates for one interpretation of his actions and motives, the evidence was more than sufficient to support a different conclusion.

Specifically, although there were several delays between phone calls and text messages, Bhogireddy continued to engage in planning with Karceski throughout August and September 2019. For instance, Karceski texted and called Bhogireddy to meet on August 11, 14, and 18. (Def. Ex. 1.) Rather than ignore his calls, Bhogireddy texted and called him in return, and the two scheduled a time to talk, eventually meeting on August 26. (Def. Ex. 1) This pattern played out more than once—Bhogireddy postponing meetings but always following up to schedule another. (Def. Ex. 1.) Bhogireddy had multiple opportunities to stop contacting Karceski but he did not do so. Further, Karceski testified that it is common for murder-for-hire schemes to take place "over the course of multiple meetings," so that the individual hiring a hitman can gauge the hitman's aptitude and to evade detection by law enforcement. (Tr. 1121–24.) As Karceski repeatedly testified, he did not contact Bhogireddy "out of the blue," and the two would often "communicat[e] back and forth, attempting to set up a time." (Tr. 1127–29.) A rational jury could rely on this evidence to find Bhogireddy guilty.

Bhogireddy further argues that his conversation with Karceski on October 2, 2019 was too vague to show any specific plan, much less a plan to kill Ganisetti. This claim is belied by the record. The evidence of what occurred at the October 2 meeting, when viewed in the context of their prior conversations, is more than sufficient to demonstrate that Karceski and Bhogireddy did have a plan. Among other evidence, Bhogireddy advised Karceski that Ganisetti sometimes commuted to work in New York City. Karceski knew where Ganisetti lived and had seen him leave his home. Although Bhogireddy had rejected any use of guns, he advised Karceski that he wanted Ganisetti's murder to look like an accident and confirmed Karceski's plan to push Ganisetti in front of a New York subway train. Contrary to Bhogireddy's contention, Karceski and Bhogireddy had formed a plan to kill Ganisetti.

Accordingly, the Court finds that a rational trier of fact could have found all the elements of Count Six beyond a reasonable doubt and therefore denies Bhogireddy's motion for a judgment of acquittal as to that count as well.

### B.    Entrapment Defense

In addition to arguing that the Government failed to prove the elements of the charged crimes beyond a reasonable doubt, Bhogireddy also contends that the Government failed to meet its burden of rebutting the instructed entrapment defense.

Entrapment involves "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553–54 (1992). An entrapment defense has two elements: "government inducement of the crime and a lack of predisposition on the part of the defendant." *United States v. Pillado*, 656 F.3d 754, 763 (7th Cir. 2011). "[T]he two elements of the entrapment defense are formally distinct but related in the sense that inducement is evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he

was predisposed to commit the crime in question." *United States v. Mayfield*, 771 F.3d 417, 430 (7th Cir. 2014) (internal quotation marks omitted) (quoting *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994)). Because entrapment is a question of fact, the jury must decide whether it has been proven "as part of its function of determining the guilt or innocence of the accused." *Id.* at 439 (quoting *Sherman v. United States*, 356 U.S. 369, 377 (1958)). At trial, the Government has the burden of proof that the defendant was either predisposed to commit the criminal act before he was approached by government agents, or that the defendant was not induced to commit the crime. *Id.* at 439–40. Here, Bhogireddy argues that the Government failed to prove both that he was predisposed to commit the charged crimes and that he was not induced to do so.

### 1.    Predisposition

A defendant was "predisposed" to commit the charged crime if he was "ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *Mayfield*, 771 F.3d at 438. The predisposition inquiry considers a defendant's mindset "***prior*** to the government's attempts to persuade the defendant to commit the crime." *Id.* at 430 (emphasis in original). However, Bhogireddy's conduct after he was contacted by a government agent may still be relevant to his predisposition, including "his actions or statements during the planning stages of the criminal scheme." *Id.* at 437.

The Court considers several factors in evaluating predisposition, including: "the defendant's character or reputation; whether the crime was originally suggested by the government; whether the defendant engaged in criminal conduct for profit; whether there was evidence that the defendant was reluctant to commit the crime; and the nature of the government's persuasion." *United States v. Chapman*, 804 F.3d 895, 903 (7th Cir. 2015)

(citation omitted). "No one factor controls, and the most significant is whether the defendant was reluctant to commit the offense." *Mayfield*, 771 F.3d at 435 (internal quotation marks omitted) (quoting *Pillado*, 656 F.3d at 766). The Court should evaluate predisposition as a "probabilistic question" that is "quintessentially factual." *Id.* at 441; *see also United States v. Anderson*, 55 F.4th 545, 553 (7th Cir. 2022) (noting that reluctance is about "probability," and not about "a moral aversion, a fear of publicity, or a fear of punishment"). Bhogireddy and the Government focus on the last two factors, and so the Court follows suit.

Bhogireddy argues that the Government failed to prove that he was predisposed to commit the charged crimes because the evidence showed that he was reluctant and the Government pressured him. Indeed, the jury heard evidence that Bhogireddy was at times reluctant to commit the charged murder-for-hire. Bhogireddy would often wait hours or days to respond to Karceski's messages. And while Bhogireddy would eventually return Karceski's calls or text messages, he did not always do so immediately. In addition, Bhogireddy seemed to be unclear about how he wanted Karceski to handle Ganisetti. For example, on June 6, 2019, Bhogireddy stated that he "did not know" if he wanted Ganisetti killed and suggested that he only wanted Ganisetti put in a coma. (Gov. Ex. 5, 07:58–08:15, Tr. 545.) Then, on July 2, 2019, Bhogireddy confirmed that he wanted Ganisetti "gone or ***something***" (Tr. 853 (emphasis added)), and asked questions like, "What if I don't know, I don't want you to take him out but something else," and "What if I changed my mind?" (Tr. 843, 853, 855.) Finally, Bhogireddy seemed to feel some degree of guilt about harming Ganisetti, who had small children. (Gov. Ex. 17, 10:20–10:38, 12:00–12:35; Tr. 584–85); *but see Anderson*, 55 F.4th at 553.

For purposes of Bhogireddy's post-trial motion, however, the Court must view the evidence in the light most favorable to the Government. Doing so, the Court concludes that a

reasonable jury could have found that Bhogireddy had a predisposition to hire a third party to murder Ganisetti. The evidence of Bhogireddy's actions and statements before meeting with Karceski are reasonably interpreted as those of a person seeking out a hitman. From his initial conversation with Tom, Karceski understood Bhogireddy to be looking for someone to murder Ganisetti for him. (Tr. 518, 713.) And when Bhogireddy initially reached out to Karceski, he asked for a "quote." (Gov Ex. 2, 00:36–01:00; Tr. 526–27.) When Bhogireddy came to his first meeting with Karceski, he appeared prepared to discuss murder. *See United States v. Theagene*, 565 F.3d 911, 919 (7th Cir. 2009) (noting that the defendant was likely predisposed as he "arrived at a meeting with the informant fully prepared to discuss options for money-laundering"). Notably, Bhogireddy had already researched how to murder his wife without leaving a trace and had talked to his father, a former police officer, about a plan to do so. (Gov. Ex. 5, 05:22–05:49, 16:50–17:29; Tr. 551.). Similarly, Bhogireddy had spoken with his father about how to make Ganisetti's murder look like an accident prior to his final meeting with Karceski. (Gov. Ex. 38, 26:22–27:30; Tr. 648–49, 1062, 1066.)

Given the totality of the evidence, what Bhogireddy describes as reluctance could also reasonably be interpreted as "a fear of punishment" or "publicity." *Anderson*, 55 F.4th at 553. Indeed, his statements regarding Ganisetti's children could reasonably be interpreted not as reducing the probability of his disposition towards the charged offenses but rather showing a "moral aversion" against murder in general. *Id.* Notably, in the same meeting where Bhogireddy expressed guilt about Ganisetti's children, he also confirmed that Ganisetti was a "problem" that he wanted Karceski to "take care" of. (Gov. Ex. 17, 10:20–10:38, 12:00–12:35; Tr. 584–85); *see also United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991) (noting that having "second thoughts following initial enthusiasm [does] not establish entrapment"). As mentioned above,

while Bhogireddy missed calls with Karceski in late August and early September 2019, Bhogireddy always called Karceski back and set up new times to talk. *See United States v. Hall*, 608 F.3d 340, 344 (7th Cir. 2010) (noting that repeated slowness to respond was not due to reluctance as "a person who was truly reluctant to commit a crime would take advantage of a ready excuse to withdraw from a criminal enterprise"). Bhogireddy's apparent guilt over Ganisetti's children did not stop him from continuing to engage in the plot. *See United States v. Theodosopoulos*, 48 F.3d 1438, 1447 (7th Cir. 1995) (noting that a defendant's failure to abandon a criminal transaction "when it encountered trouble spots" is evidence of a lack of reluctance).

In short, the jury could reasonably infer from the evidence at trial that Bhogireddy was ready and willing to commit the charged crimes before his first meeting with Karceski—he simply lacked the means to do so. *Mayfield*, 771 F.3d at 438. Accordingly, the Court rejects Bhogireddy's argument that the Government failed to prove that he was predisposed to commit the charged crimes.

### 2.     Inducement

Inducement is "more than mere government solicitation of the crime;" rather, "inducement means government solicitation of the crime ***plus*** some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434–35. The "other conduct" can be "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct" that may create a risk that an individual "who otherwise would not commit the crime if left alone" nonetheless will do so "in response to the government's efforts." *Id.* (internal quotation marks omitted).

According to Bhogireddy, it was Karceski's repeated calls that induced him to commit the charged crimes and that resulted in, at best, a vague and impossible plan to do so. In fact, there are several examples in the evidentiary record where the Government initiated and sustained communication with Bhogireddy, culminating with Bhogireddy and Karceski formulating an arguably vague plan on October 2, 2019. For example, Karceski instructed the confidential source to call Bhogireddy twice. Additionally, Karceski repeatedly called and texted Bhogireddy to prompt his attention. For example, Karceski called Bhogireddy three times and texted him once on July 15, 2019, with Bhogireddy answering the next day. Karceski also texted and called Bhogireddy on July 28 and July 29, with Bhogireddy eventually responding by putting off their meeting for a week. Karceski repeatedly called and texted Bhogireddy on August 11, 14, and 18, only to have Bhogireddy answer on August 23. Bhogireddy affirmatively put off meeting in early September due to his court date and even failed to come to a meeting.

However, viewed in the light most favorable to the Government, the evidence supports a very different narrative. While Karceski instructed Tom to call Bhogireddy, Bhogireddy affirmatively reached out to Karceski to meet in-person about a "quote." (Gov Ex. 2, 00:36–01:00; Tr. 526–27.) And although Karceski may have called and texted Bhogireddy repeatedly, Bhogireddy always returned Karceski's calls. *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995) (noting that a government agent's "persistence is not alone sufficient to carry the case beyond an ordinary opportunity" to commit a crime). While at times Bhogireddy postponed meetings, he always proposed new meeting times or returned calls to do so. *See Mandel*, 647 F.3d at 718–19 (where defendant both accepted the government source's calls and initiated his own calls to the source, he was not induced sufficiently to find entrapment); *see also United States v. Diaz-Maldonado*, 727 F.3d 130, 138 (7th Cir. 2013) (noting that while the defendant

could have raised a scheduling conflict as a "polite way" of declining to get involved, because the defendant later became involved in the charged crime on his own initiation, he was not induced to do so). While the plan ultimately conceived to murder Ganisetti was potentially problematic, it was not impossible, as Bhogireddy suggests. In short, a rational trier of fact could find that the Government proved beyond a reasonable doubt that Bhogireddy was not induced to commit the charged crimes.

Because there was sufficient evidence to support each of the five counts of conviction and to rebut Bhogireddy's entrapment defense, Bhogireddy's motion for a judgment of acquittal is denied.

## CONCLUSION

For the reasons stated above, Bhogireddy's motions for a new trial (Dkt. No. 168) and motion for judgment of acquittal (Dkt. No. 169) are denied.

ENTERED:

Dated: March 1, 2024

_____
Andrea R. Wood
United States District Judge